**MICROWARE SYSTEMS CORP., Plaintiff,**

v.

**APPLE COMPUTER, INC., Defendant.**

**No. 4–99–CV–90496.**

United States District Court, S.D. Iowa, Central Division.

March 15, 2000.

Kent A. Herink, David A. Tank, Davis Brown Koehn Shors & Roberts PC, Des Moines, IA, for plaintiff.

Jeffrey D. Harty, Edmund J. Sease, Zarley McKee Thomte Vorhees & Sease, Des Moines, IA, Patrick Lynch, O'Melveny & Myers LLP, Los Angeles, CA, George A. Riley, O'Melveny & Myers, LLP, San Francisco, CA, for defendant.

## ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PRATT, District Judge.

Before the Court are (1) Plaintiff's Motion for Preliminary Injunction filed October 14, 1999 and (2) Defendant's Motion for Summary Judgment filed November 26, 1999. The parties timely resisted and replied to the respective motions. The Court conducted a fact-intensive hearing and heard witness testimony on the merits of these motions on February 9 10, 2000 at the United States Courthouse in Des Moines, Iowa. Plaintiff requested, and the Court granted, an extension until March 13, 2000 to file an additional brief and argument on evidentiary items. The Court has read and reviewed both parties' submissions. The matter is submitted. After carefully reviewing the facts and law in this case, the Court denies Plaintiff's Motion for Preliminary Injunction and grants Defendant's Motion for Summary Judgment.

### I. Facts

This is a trademark infringement action brought by Plaintiff Microware Systems Corp. ("Microware") against Defendant Apple Computer, Inc. ("Apple") under provisions of the Lanham Act, 15 U.S.C. §§ 1051–1127. Microware's federal claim is in three counts: trademark infringement (Count I); unfair competition (Count II); and dilution (Count III). Microware also pleads state law infringement and unfair competition.

The crux of the Complaint alleges that Apple's launching of its most recent computer operating system, "MAC OS–9" for Apple's Macintosh personal computer, constitutes willful and intentional infringement of Microware's federally registered trademark "OS–9"—a mark which has been federally registered since September 19, 1989. *See* Count I of Compl. at para. 16. The Complaint further alleges that Apple's use of the name "MAC OS 9" has caused confusion to consumers and substantially and irreparably damaged Microware. *Id.* at para. 17. Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Microware filed the present Motion for Preliminary Injunction seeking to enjoin Apple from describing, marketing, or otherwise designating the latest version of Apple's operating system under the name "MAC OS 9". Apple defends by denying that confusion exists in the marketplace or that Microware has been damaged in any way by Apple's release of Mac OS 9. Second, Apple argues that even if there is confusion and Microware has been damaged, Apple's fair and good faith use of "OS 9" in the name "MAC OS 9" operates as a complete defense to the trademark infringement claim. *See* 15 U.S.C. § 1115 (codifying the so-called "fair use" doctrine). The "fair use" defense is the subject of Apple's Motion for Summary Judgment.

Before turning to the merits, a brief description of the history of the software

products at issue in this litigation will be helpful in resolving the legal contentions raised by the parties. To the extent the history bears on Apple's Motion for Summary Judgment, the Court will view such history in a light most favorable to Microware. *See Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994).

As stated in its moving papers, Microware is an Iowa corporation and has been a developer of real time operating system (RTOS) software since at least 1980. RTOS computer software enables a full range of high-tech or "smart" devices from cellular telephones and wireless communication devices to anti-lock brakes to function properly. Collectively, the RTOS software and the sophisticated devices that are run by it are known in the computer industry as "embedded systems." Microware competes directly with other RTOS developers in the embedded systems market.

OS–9 was the trade name Microware gave to its first line of real time operating systems and related tools. Now trademarked, OS–9 is the name Microware still uses to call its RTOS products. Microware has developed a line of OS–9 products for use in a number of commercial areas: industrial automation, transportation, medical, and government/military systems; communications infrastructure devices and equipment; and consumer products such as digital television decoders, wireless telephones, and internet appliances.

Microware licenses its OS–9 RTOS not to general consumers but to "original equipment manufacturers" (OEMSs) such as Motorola, Philips Electronics, Fujitsu, IBM, Avnet Electronics Marketing, and Rockwell Collins. Licenses range from $4,000 for a base industrial OS–9 license to $150,000 for a standard Digital Audio Video Interactive Decoder system. Microware has enjoyed considerable financial success. For example, over its lifetime,

Microware has posted revenues of over $184 million, with substantially all of that coming from sales of its OS–9 operating system.

Unlike Microware, whose main business is in the sophisticated, RTOS market, Apple makes and sells an operating system that only runs on Apple personal computers. Since at least 1991, Apple has utilized a sequential numbering system to denominate new releases of its operating system for use in its Macintosh personal computer. For instance, in 1991 Apple released "System 7" operating system. Periodically, successive updates of the operating system were released with corresponding changes in the decimal number: System 7.1, 7.1.2, 7.1.3, 7.5, etc. In 1994, Apple announced "Mac OS" as the new name for its operating software—a name for which Apple eventually received a trademark. In January 1997, Apple released Mac OS 7.6; major and minor upgrades to the operating system were denominated by upward changes in the whole number and decimal number, respectively. Thus, from January 1997 to May 1999, Apple issued versions of its operating software under the following naming scheme:

1/97—Mac OS 7.6

7/97—Mac OS 8

1/98—Mac OS 8.1

10/98—Mac OS 8.5

5/99—Mac OS 8.6

Thus, version numbers increased, which is typical software industry practice, with each new major or minor release.

█ On July 21, 1999, Apple announced that its upcoming version of the Mac OS would be called "Mac OS 9." [1] Around this time, Microware learned of discussions on the internet and in newspapers and magazines regarding the introduction of Apple's Mac OS 9 operating system. "Many of the discussions," Microware claimed, "have focused on the confusion created by [Ap-

---

**1.** In keeping with its general pattern, Apple plans on introducing "Mac OS X" in the summer of 2000.

ple's] selection of a product name identical to that of [Microware]." *See* Compl. at para. 15.[2] Given the publicity surrounding the announcement of Mac OS 9 and the apparent fear that consumers would be confused with two software products with "OS 9" in their name, Microware filed the present action.

The Court first will address Plaintiff's Motion for Preliminary Injunction and then decide Defendant's Motion for Summary Judgment.

## II. Preliminary Injunction

■ In deciding whether to issue a preliminary injunction, the district court must weigh (1) the probability that the moving party will succeed on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance of hardships should the injunction issue; and (4) the public interest. *See United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1178–79 (8th Cir. 1998); *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (en banc). All of the *Dataphase* factors, as they have come to be called, must be considered and balanced to determine whether to grant this "extraordinary remedy." *See Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987).

### A. Likelihood of success on the merits

■ To prevail under the Lanham Act, Microware must prove that Apple's

use of the name Mac OS 9 "creates a likelihood of confusion, deception, or mistake among an appreciable number of ordinary buyers as to the source of or association" between the two companies. *Duluth News–Tribune v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1096 (8th Cir.1996) (citing 15 U.S.C. § 1114(1) and *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626 (8th Cir. 1987)). The ultimate inquiry in a trademark infringement claim "always is whether, considering all the circumstances, a likelihood exists that consumers will be confused about the source of the allegedly infringing product." *Hubbard Feeds, Inc., v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 602 (8th Cir.1999) (Eighth Circuit citations omitted). The "circumstances" relevant to this analysis include: "(1) the strength of the owner's mark; (2) the similarity of the owner's mark to the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to 'pass off' its goods as those of the trademark owner; (5) incidents of actual confusion; and (6) whether the degree of care exercised by the consumer can eliminate a likelihood of confusion that otherwise would exist." *Id.*

■ After weighing the considerations as they apply to this record and reviewing the case law in this area, the Court concludes that Microware has not met its burden of showing a likelihood of success on the merits.

**2.** On February 8, 2000, Apple filed *in limine* a Motion to Strike Internet Postings to preclude Microware from offering into evidence various internet postings and e-mails. On the same day, Apple filed *in limine* a Motion to Strike Purported Evidence From "Infoworld Media Group." The latter motion, which the Court grants, seeks to strike an internet article which falsely attributes to Steve Jobs, Apple's C.E.O., a statement about Apple's Mac OS X operating system.

As to the internet and e-mail postings of Apple's first motion *in limine,* the Court recognizes Apple's hearsay concerns, but will receive the evidence in any case. As with the survey evidence which Apple relies on, *see infra* at 1216 n. 11, Microware's internet and

e-mail submissions are not ideal proffers of evidence since their authors cannot be cross-examined. *Cf. SquirtCo. v. Seven–Up Co.*, 628 F.2d 1086, 1089, 1091 (8th Cir.1980). However, in a case involving an industry where e-mail and internet communication are a fact of life, these technical deficiencies must go to the weight of such evidence, rather than to their admissibility. *See id.* In any case, to the extent any of these stray comments bear on the issue of confusion, they come in for that purpose; alternatively, under Rule 803(3) of the Federal Rules of Evidence, they can be offered for whatever truth they hold. *See Armco, Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1160 n. 10 (5th Cir.1982).

### 1. Strength of Microware's mark

■ Microware argues that OS–9 is a strong mark because the mark has received "incontestable" status [3] and because Microware has expended considerable financial resources to market and advertise its OS–9 product. Generally speaking, "strong" marks are afforded broad protection; "weak" ones get limited protection. This principle applies not only to registered trademarks, *General Mills*, 824 F.2d at 626 (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 12–13 (2d Cir.1976)) ("when mark has some descriptive qualities, not every competing use may be excluded even when mark is properly registered"), but also to so-called incontestable marks like Microware's, *see Jeld–Wen, Inc. v. Dalco Indus., Inc.*, 198 F.3d 250, 1999 WL 1024002, at *2 (8th Cir. Nov.10, 1999) (unpublished per curiam) [4] (quoting *Union Carbide Corp. v. Ever–Ready Inc.*, 531 F.2d 366, 377 (7th Cir. 1976)) ("An incontestable mark does not allow 'a registrant to claim rights over a greater range of products than he would otherwise be entitled to claim.' "); *see also id.* (quoting *Sunmark, Inc. v. Ocean Spray Cranberries, Inc.*, 64 F.3d 1055, 1058 (7th Cir.1995)) ("That Swee TARTS is an incontestible mark for sugar candy does not make plaintiff the gatekeeper of these words for the whole food industry.")(brackets omitted). Therefore, just because OS 9 is an "incontestible" trademark does not render it immune from an attack that the mark is weak and thus deserving of limited protection.

There is no denying that federal registration confers a "great deal of strength" on an incontestable mark, like OS–9, *see Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1118 (7th Cir. 1997). But the concept of "strength," by itself, is meaningless. A company's trademark may be strong in one market but weak in another. *See Jeld–Wen*, 1999 WL 1024002, at *4 (quoting *IDV North America, Inc. v. S & M Brands, Inc.*, 26 F.Supp.2d 815, 824 (E.D.Va.1998)) ("A mark which is strong in its field is not as susceptible to confusion with an identical mark used in connection with a dissimilar, albeit somewhat related, field.") (brackets omitted); *see id.* (citing *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 260 (5th Cir.1980)) ("Domino" mark is strong in sugar products but weak for other food products).

In this case, there is evidence that OS–9 might be a strong name in the specialized RTOS market but a weak name in the personal computer market. For example, in fiscal year 1999, Microware spent over $11.4 million marketing OS–9 in trade shows, trade magazines, and professional journals. *See* Pl.'s Memo. of Law in Supp. of Mot. for Prelim. Inj. at 2; Def.'s Ex. M.[5] Although there is no evidence that Plaintiff's advertising and sales efforts have caused the computer-buying public to

---

**3.** Plaintiff's mark obtained incontestible status on April 25, 1995. Incontestible trademarks are ones which have been registered and in continuous use for five consecutive years subsequent to the date of registration. *See* 15 U.S.C. § 1065. Subject to a number of defenses (including fair-use), an "incontestible" mark is "conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce" as "specified in the affidavit filed" upon registration. 15 U.S.C. § 1115(b).

**4.** In *Jeld–Wen*, the plaintiff, owner of an incontestable mark in "Elite" (a brand of wood doors) sued the maker of vinyl windows and doors which sold under the name "Elite 4000." Given the similarity of facts and the Court's helpful analysis, this Court finds the *Jeld–Wen* opinion persuasive. *See* Rule 28A(i) of the Eighth Circuit Rules of Appellate Procedure (1998 version).

**5.** The following are publications where Plaintiff has advertised its OS 9 product: *C User's Journal, Communications System Design, Computer Design, EDN Magazine, EE Times, Electronic Design, Embedded Systems Development, Embedded Systems Programming, Embedded Systems Programming Product News, Personal Engineering & Instrumentation, Portable Design, The Real Times, Vision Systems Design, Wireless Systems Design.* Def.'s Ex. M.

"equate the mark with the source of the product." *Co–Rect Prods., Inc. v. Marvy! Advert. Photography, Inc.,* 780 F.2d 1324, 1332 (8th Cir.1985)—which is what Plaintiff needs to show before it can equate advertising/sales efforts with product identification-the Court will assume OS–9 is a strong name in the embedded systems industry. On the flip side, Apple submits evidence showing the name OS–9 to be unrecognizable among buyers of Apple products. For example, among both buyers and software developers of Macintosh computers, Plaintiff's mark has no recognition at all. On balance therefore, even though the mark OS–9 may be strong in the RTOS/embedded systems market, the mark is weak overall among those who would be potential purchasers and users of desktop personal computers and operating systems.

■ At best the name OS–9 is, in trademark parlance, a "descriptive" mark lacking "secondary meaning." "A descriptive mark . . . immediately conveys the nature or function of the product[.]" *Duluth News–Tribune,* 84 F.3d at 1096. Descriptive marks are entitled to protection only if it has become distinctive by acquiring a "secondary meaning." *Id.* A descriptive mark may acquire secondary meaning if it has become so associated with the product that it identifies the source of the product and distinguishes the product from those of others. *First Bank v. First Bank System, Inc.,* 84 F.3d 1040, 1045 (8th Cir. 1996). In other words, if one associates "OS 9" with "Microware Corporation" then it can be said that OS–9 has secondary meaning. *See id.* ("The primary inquiry in determining whether the mark has attained secondary meaning is wether the mark has become associated with a partic-

ular source in the consumer's mind."). Microware's mark is descriptive because "OS" is widely regarded as industry shorthand for "operating system." Likewise, it is common practice in the software industry to indicate versions of a given product with a numerical reference: CorelDraw9, Conflict Catcher 8, Lotus Organizer 6, Internet Explorer 5, Chorus OS 4.0, JavaOS 3.0, and AOL 5.0, etc. *See* Def.'s Memo. of Law in Opp'n to Pl.'s Mot. for Prelim. Inj. at 17; Def.'s Ex. O. The fact Microware does not ascribe meaning to its use of the number 9 is not significant. It does not alter the conclusion, based on the record, that OS 9, while descriptive of some type of operating software, does not contain a secondary meaning such that it "has become associated with a particular source in the consumer's mind." *First Bank,* 84 F.3d at 1045.[6] This is all to say that OS–9 is ultimately a weak mark among consumers in the operating system market. *See General Mills,* 824 F.2d at 626–27 (evidence of third party usage of similar marks on similar goods shows that mark is "relatively weak" and "entitled to a narrower scope of protection").

### 2. Similarity of the marks

"The use of identical, even dominant, words in common does not automatically mean that two marks are similar. . . . Rather, in analyzing the similarities of sight, sound, and meaning between two marks, a court must look to the overall impression created by the marks and not merely compare individual features." *Id.* at 627 (citations omitted).

Microware contends that Mac OS 9 and OS–9 share a "striking similarity" in sound, sight, and appearance. It further

**6.** The fact OS 9 lacks any independent, secondary meaning is underscored quite forcefully when one considers the various product titles which use the letters "OS" alone or in combination with some number in their name. Defendant introduced a one-page list of registered trademarks which contained seven product names employing the letters "OS" plus a number in their name: One OS, OS/2, OS/2 Warp, OS/286, OS/390, OS/400, Sparc64/OS. *See* Def.'s Ex. P. Ten registered trademarks use "OS" only: Access OS, BeOs, DMS/OS, Enterprise OS, K/OS, newdeal OS, Net⇔OS, OS Comet, OS Plus, Palm OS. *Id.* Similarly, of non-registered titles, at least 27 use "OS" in their name without a number. *Id.* In short, while these marks describe some type of operating system, they do not immediately call to mind a source, i.e., the companies that own these marks.

contends that in keeping with the human tendency to abbreviate long names, various media outlets and Apple's interim CEO Steve Jobs have shortened "Mac OS 9" to just "OS 9." Such similarities in sight, sound, and appearance combined with the occasional tendency to omit the "Mac" portion of "Mac OS–9", Microware argues, "clearly create[ ] a substantial likelihood of confusion." Pl.'s Memo. in Supp. at 12. Apple does not deny the overlap of "OS 9"in its product's name. And there is evidence of inter-office e-mails showing Apple officials occasionally referring to their product as "OS 9." *See* Pl.'s Ex. 74a-r. Apple, however, urges a broader reading of similarity so as to embrace not just similarities in sight and sound, but to consider the "circumstances under which the marks are encountered in the marketplace." Def.'s Memo. in Opp'n at 18.

There's no denying the two marks are similar—the parties wouldn't be in court if they weren't. The "Mac" portion aside, Plaintiff's and Defendant's marks are pronounced the same; they're spelled the same (though Microware's mark has a hyphen between the OS and 9 whereas Apple's does not); and when they appear in printed text (as in an article or brochure) they look the same (save for the hyphen). If that were extent of the analysis, the inquiry would stop there.

The cases of course all go further. In fact, the whole point of the inquiry turns on whether the "overall impression" created by the marks are such that a likelihood of consumer confusion will result. *General Mills*, 824 F.2d at 627. In this light, the similarities between OS 9 and Mac OS 9 would not lead to consumer confusion. First, given that Microware only sells its product to OEM's on a licensing basis and not to the consumer retail market, it would be nearly impossible for a prospective buyer of OS–9 to mistakenly purchase Mac OS 9. The converse holds true as well: it would be nearly impossible for prospective Mas OS 9 customers to inadvertently buy Microware's more sophisticated (and much more expensive) OS–9 RTOS software, no matter how alike in appearance the marks might be.

Second, even assuming Microware sold its OS 9 product on the retail consumer market and shared shelf space with boxes of Apple's Mac OS 9, Apple's product is distinctive and clearly identifies its source. Mac OS 9 is packaged in a white box bearing a very large and bright orange number "9." The name "Mac OS 9" appears in smaller print near the bottom just above the words "Featuring Sherlock 2"—Apple's integrated Internet search program. Apple's corporate logo (a red apple) and the word "Mac" also appear prominently on the package. The overall impression created by this packaging reasonably identifies to the consumer the source of the product as belonging to Apple Computer, Inc. (and not Microware Systems Corp.). This fact reduces the likelihood that consumers would be confused as to the product's source. *See Duluth News–Tribune*, 84 F.3d at 1097 (display of mark in conjunction with the clearly displayed name of manufacturer lessens the likelihood of confusion) (citation omitted).

By contrast, the look of Microware's corporate logo and OS–9 mark is noticeably different from Apple's. Plaintiff's logo is identified by a large, stylishly designed "M" in the center of a blue globe—all centered just above the word "MICRO-WARE." In some publications, *see e.g.* Pl.'s Ex. 9 (OS 9 brochure) *and* Pl.'s Ex. 22 (Microware press release), the name Microware appears in bold, cursive script. In general, the mark "OS–9" is not usually presented in any distinctive manner; it appears in regular, type-written script. Granted, the names of the two marks share certain grammatical properties; and sometimes, Apple executives abbreviated Mac OS 9 to OS 9 in inter-company memoranda. None of those observations, however, can deny that the overall impression of the marks, as reflected in the different colors and typefaces used, conveys in the eyes of an *ordinary purchaser*, "percepti-

ble distinctions" between the two products. *See Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 831 (8th Cir.1999) (citing cases showing how placement of corporate logos, colors, and typefaces diminish the likelihood of confusion); *First Nat'l Bank in Sioux Falls v. First Nat'l Bank, South Dakota*, 153 F.3d 885, 889–90 (8th Cir. 1998) (citing cases in support of conclusion that there is minimal or no likelihood of confusion where, even though bank names share the same dominant terms, the bank logos are distinct ). The fact the two products are marketed toward two fundamentally different purchasers in two distinct markets underscores the lack of similarity in this case.

### 3. Competition between the products

By Plaintiff's own concession, Microware's OS–9 does "n[o]t compete in any way with Mac OS 9 and desktop operating system[s]," [7] nor has Microware done so in the past 10 years.[8] This fact weighs against an ultimate finding of likely consumer confusion.

### 4. Intent to "pass off" goods as those of the trademark owner

Once again, by Plaintiff's own concession, there is no evidence that Apple ever intended to trade on Microware's good will with the introduction of Mac OS 9.[9] Even if Apple knew about Microware's product and wished to compete with it with the introduction of Mac OS 9, that by itself is not enough to show a bad faith intent to compete. *See General Mills*, 824 F.2d at 627 ("Knowledge of another's product and an intent to compete with that product is not ... equivalent to an intent by a new entrant to a market to mislead and to cause consumer confusion."). As before, this fact weights against an ultimate finding of likely consumer confusion.

### 5. Actual confusion

"The Lanham Act seeks to prevent consumer confusion that enables a seller to pass off his goods as the goods of another." *W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.*, 984 F.2d 567, 574 (2d Cir.1993) (internal citations and quotes omitted), *modified on different grounds*, 41 F.3d 39 (2d Cir.1994).

"When determining whether there exists a likelihood of confusion, weight is given to the number and extent of instances of actual confusion." *Duluth News–Tribune*, 84 F.3d at 1098. On this point, Plaintiff contends, over Defendant's objection, that several e-mails and postings from internet discussion groups demonstrate evidence of actual confusion. Quoting *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir.1971), Microware asserts that "[t]here can be no more positive or substantial proof of likelihood of confusion than proof of actual confusion." Most of Microware's proof of actual consumer confusion comes in the way of print-outs of e-mails and internet postings. (The Court counts just over 50 such submissions).[10] Microware also offers statements from its C.E.O., its C.F.O., and a computer consultant suggesting actual confusion. The Court will address the internet and e-mail evidence first and then respond to Microware's testimonial evidence.

#### i. Internet and e-mail evidence.

Having examined each of these electronic postings, the Court rejects the contention that they demonstrate either actual or likely consumer confusion. At least eleven postings were simply off-topic banter about matters having nothing to do with the trademark names in this case. At least 25 submissions were devoted entirely to a discussion of Macintosh hardware and

**7.** *See* Hr'g Tr. of 2/9/00 at 173 (cross-examination testimony of Kenneth Kaplan, Microware's President and Chief Executive Officer).

**8.** *See id.* at 183 (Kaplan cross-examination).

**9.** *See id.* at 238 (Kaplan cross-examination).

**10.** On day one of the hearing, these e-mail and internet postings were marked as Plaintiff's Exhibits 66a–66cc and Exhibits 73a–73v.

software products. There was no mention of Microware or its product in this batch of documents. The Court counted at least seven submissions that, while referencing the two marks, clearly showed that the authors were not confused. Within this grouping, the following message was typical: "... When is Apple going to stop using the OS–9 logo? [I]t really bothers me..[.] they keep coming up in my searches[.]" Pl.'s Ex. 68m. Another message stated: "... I need to be able to do Digital Viedo [sic] editing on my Hand held PC, and guess what os–9 supports FIREWIRE[.] Don't get Mwar's os–9 confused with Apple's os–9[.]" Pl.'s Ex. 68j. In a group consisting of two postings, the authors are Macintosh users looking to buy Mac OS 9. The catch is (and this apparently explains why Plaintiff offers them) the writers erroneously e-mailed their queries to employees of Microware. These two postings hardly demonstrate consumers confusion; and even if they were so construed, they are de minimis and otherwise show the writers' inattentiveness. *See Duluth News–Tribune*, 84 F.3d at 1098 (finding evidence of misdirected mail and phone calls "de minimis" demonstrating "inattentiveness on the part of the caller or sender rather than actual confusion") (citing J. Thomas McCarthy, *Trademarks and Unfair Competition*, § 23.2, p. 52 n. 1 (2d ed.1984)). Finally, there are six messages from random individuals simply wondering aloud or expressing curiosity over the two marks. One e-mail sent to a Microware employee reads: "I keep reading Apple news about their OS 9. Does Apples OS 9 have anything to do with your OS 9?" Pl.s Ex. 68f. Another

one asks: "I'm trying to find out if OS9 and Mac OS9 are related. Is the Mac version just an extension of their own OS that happens to be at the revision level 9 now? Or is it actually Microware OS9 adapted for the Mac?" Pl.'s Ex. 68b. In this last class of postings, there's no indication who any of these writers are, let alone if they are potential purchasers of Microware's OS–9 confused by the market presence of Apple's Mac OS 9, *but see Champions Golf Club, Inc. v. The Champions Golf Club, Inc.,* 78 F.3d 1111, 1119 (6th Cir.1996) (finding no requirement that evidence of actual confusion, to be relevant, "must be confusion at the point of sale—purchaser confusion—and not the confusion of nonpurchasing, casual observers") (citation omitted). In any case, they are de minimis examples. Although the Court admits all of these e-mail and internet items into evidence, the Court finds they bear little, if any, on the issue of actual or likely confusion. In fact, with the possible exception of the last six postings, the sum of these items suggests a manifest *lack* of consumer confusion in the market.[11]

### ii. Testimonial evidence

Microware offers the testimony of its C.E.O. Ken Kaplan who testified at the hearing that after the introduction of Mac OS 9, he was approached by people (sometimes friends) who congratulated him on the "wonderful deal we had with Apple." Hr'g Tr. of 2/9/00 at 137. He also testified that at one trade show, three people approached him and inquired about information regarding a joint Microware/Apple product. *Id.* at 161–62. In addition to

11. For its part, Apple has submitted the results of its own investigation into customer inquiries that, as part of the normal course of its business, reach Apple through 1–800 customer service numbers and e-mail contacts. Apple searched this database from July 1999 (when Mac OS 9 was announced) to the end of January 2000. It looked for any instance of any communication with customers that mentioned Microware, real time operating systems, the label RTOS, OS 9, or "anything of that nature that could point to any possible

communication regarding Microware or their OS 9 product." Hr'g Tr. of 2/10/00 at 290 (direct examination testimony of Philip Schiller). Of the 1,022,342 inquiries, five dealt with a dealer and distributor in Alaska by the name of Microware and one referenced a cable provider named Kensington Microware. *Id.* at 291. Apart from that, Apple found no instances of consumer confusion among its customers-a result left unimpeached by Microware.

Kaplan's testimonials, Microware offers the deposition testimony of its C.F.O. George Leonard ("Leonard"). Leonard recalled that introduction of Mac OS 9 prompted "several" Microware employees and three members of the investment community to ask if Microware had struck a "deal" with Apple. *See* Pl.'s Memo. of Law in Opp'n to Def.'s Mot. to Strike Internet Postings at 3 (hereinafter "Plaintiff's Internet Brief"). Finally, there is the deposition testimony of computer consultant Chris Dilley who, after learning of Mac OS 9's introduction, asked a Microware employee if Apple had purchased the OS 9 system from Microware. Dilley wanted to buy the stock if that was the case. Dilley changed his mind after the employee explained that the Apple product did not involve Microware. *See* Plaintiff's Internet Brief at 3–4.

The Court finds this evidence unpersuasive. The Kaplan and Leonard testimony, like some of the e-mail and internet evidence above, merely shows that various individuals wondered about the existence of an Apple/Microware partnership and sought further information. Only with respect to the Dilley testimony could it be said there is evidence of actual confusion.

Unfortunately, trademark laws cannot provide absolute protection to owners of common trademark names. There will be occasional overlap, sometimes harmless, temporary, and coincidental (as here); sometimes intentional. "Ownership of a trademark," observed the Third Circuit, "does not guarantee total absence of confusion in the marketplace. Selection of a mark with a common surname naturally entails a risk of some uncertainty and the law will not assure absolute protection. Each case of trademark infringement must be evaluated on its own facts and circumstances." *Scott Paper,* 589 F.2d at 1231 (footnote and citations omitted).

Microware's evidence of actual or likely confusion, on balance, is weak. Those pieces that come close to evidencing actual confusion are not enough, by themselves, to sway the Court's analysis. The Eight Circuit put it well when it noted that "even several isolated incidents of actual confusion that occur initially upon the creation of a potentially confusing mark are insufficient to establish a genuine issue of material fact as to the likelihood of confusion." *Duluth News–Tribune,* 84 F.3d at 1098–99 (citing *Astra Pharmaceutical Prod. Inc. v. Beckman Instruments Inc.,* 718 F.2d 1201, 1207–08 (1st Cir.1983); *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1231 (3d Cir.1978)). "[W]e look to whether an appreciable number of ordinary purchasers are likely to be [ ] misled, and here the record before [the Court] compels an answer in the negative." *Id.* at 1099.

6. **Whether consumer care can eliminate the likelihood of confusion**

In considering the role of the consumer, courts "must stand in the shoes of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Luigino's,* 170 F.3d at 831 (internal quotes and citations omitted). Given the fundamentally distinct nature of the two products at issue, the different marketing methods, and differences in individuals who buys each product, it is self-evident that a reasonable purchaser would not be confused with the presence of Mac OS 9 in the market.

As explained above, Microware sells its OS–9 RTOS products to original equipment manufacturers under expensive licensing agreements. Microware's customers are predominantly corporations and organizations in the high tech, communications, and manufacturing industries. *See* Pl.'s Ex. 4 (OS–9 OEM Licensees). These customers pay anywhere from $4,000 to $150,000 for an OS–9 license. By contrast, Macintosh computers and Mac OS–9 are sold directly to consumers by Apple and retailers. The retail price for the standalone Mac OS 9 is just under $100. Apple has no plans or intention of using the Mac OS 9 as an RTOS for embedded applications. Under these circumstances, it would be difficult to imagine a scenario where a

prospective buyer of OS–9, expecting to invest thousands of dollars in a sophisticated operating system, would, out of confusion or mistake, purchase the Mac OS–9 product for less than a hundred dollars a unit. *Jeld–Wen,* 1999 WL 1024002 at *5. Likewise, no prospective Mac OS 9 buyer would accidentally stumble into a sophisticated and expensive licensing agreement regarding Microware's OS–9. That defies common sense.

In sum, the Court finds that all six factors that bear on a likelihood of consumer confusion point in favor of Defendant. Accordingly, Plaintiff has not met its burden of showing a likelihood of success on the merits. *Dataphase Sys.,* 640 F.2d at 114.

### B. Threat of irreparable harm to Microware .

Under this portion of the *Dataphase* analysis, Microware asserts that the only irreparable harm that Plaintiff needs to show consists of a likelihood of confusion. *See Calvin Klein,* 815 F.2d at 505 (district court correctly noted it could presume irreparable injury from a finding of probable success in proving likelihood of confusion). Microware concludes that "Apple's use of the mark 'MAC OS 9' has, and will continue, to result in confusion, and the irreparable harm to Microware will flow quite naturally therefrom." Pl.'s Memo. of Law in Supp. of Mot. for Prelim. Inj. at 18. Relying on *Cellular Sales, Inc. v. Mackay,* 942 F.2d 483, 487 (8th Cir.1991), Apple disputes the contention that a finding of likely confusion is coterminous with a finding of irreparable harm and that therefore Microware is not excused from making a showing of harm. Apple argues, therefore, that because Microware has not put on proof of any actual loss in sales, or otherwise demonstrated economic loss because of the presence of Mac OS 9 in the marketplace, then it has failed to show irreparable harm.

12. By way of comparison, Apple put on evidence at the hearing regarding the financial impact a preliminary injunction would have. Apple conservatively estimated that an injunc-

The debate is academic. Even assuming Microware could prevail under *Dataphase* absent a showing of actual financial loss, a result which is theoretically possible, *see Sweetarts v. Sunline, Inc.,* 380 F.2d 923, 926 (8th Cir.1967) (injunction in a trademark case still possible even absent proof of loss of sales), Microware at least has to demonstrate a likelihood of confusion before it can conclude it has suffered irreparable harm, *United Indus. Corp. v. Clorox Co.,* 140 F.3d 1175, 1183–84 (8th Cir.1998); *General Mills,* 824 F.2d at 625. The Court's finding of no likelihood of confusion therefore forecloses any possibility that Plaintiff could demonstrate irreparable harm. The fact that Plaintiff cannot point to any economic or financial loss due to the introduction of Mac OS 9 only fortifies the conclusion that Plaintiff's have not suffered irreparable harm in this case.

That said, these observations are not to diminish or deny Microware's subjective fears that the presence of Mac OS 9 in the marketplace may represent a potential threat to the good will and reputation of Microware's OS–9 product line. Good faith fear of this threat, however, is not the standard for issuing the awesome power of injunctive relief. The laws under which this Court operates teach that such power be reserved for only the most compelling of situations. *Dataphase,* 640 F.2d at 113 and n. 5; *Calvin Klein,* 815 F.2d at 503; *Baker Elec. Coop., Inc. v. Chaske,* 28 F.3d 1466, 1472 (8th Cir.1994). Unfortunately, this case is not one of them.

### C. Balance of hardships and the public interest

Microware's remaining arguments regarding the third and fourth *Dataphase* factors, the balance of hardships and the public interest, are unconvincing and cannot overcome its failure to show a probability of success on the merits and the threat of irreparable injury.[12] *See Baker*

tion would cost the company approximately $529.7 million in the second fiscal quarter of

*Elec. Coop.,* 28 F.3d at 1472 (8th Cir.1994) ("No single factor in itself is dispositive[,] .... [h]owever, a party moving for a preliminary injunction is required to show the threat of irreparable harm.") (internal quotation and citation omitted).

Given the Court's discussion regarding the threshold showing under *Dataphase,* together with the analysis of the merits requirements under the Lanham Act, the Court denies Microware's Motion for a Preliminary Injunction.

### III. Summary Judgment on Fair Use

Apple's fair use defense, codified at 15 U.S.C. § 1115(b), is the subject of its Motion for Summary Judgment.

The purpose of summary judgment is to "pierce the boilerplate of the pleading and assay the parties' proof in order to determine whether trial is actually required." 11 *Moore's Federal Practice* 3d, § 56.02 at 56–20 (Matthew Bender 3d ed.1997)(citing *Wynne v. Tufts Univ. School of Medicine,* 976 F.2d 791, 794 (1st Cir.1992), *cert denied,* 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993)).

"The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Handeen v. Lemaire,* 112 F.3d 1339, 1345 (8th Cir. 1997) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Thus, summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994). In a motion for summary judgement, the court only determines whether there are

any disputed issues and, if so, whether those issues are both genuine and material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253–54, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material." *Id.*

By statute, an incontestible trademark is subject to the defense that "the use of the name [or] term ... charged to be an infringement is a use, otherwise than as a mark, of ... a term ... which is descriptive of and used fairly and in good faith only to describe the goods or services of such party...." 15 U.S.C. § 1115(b)(4). The Court in *Car-Freshner Corp. v. S.C. Johnson & Son, Inc.,* 70 F.3d 267 (2d Cir.1995) expressed this so-called fair use doctrine in somewhat plainer terms:

It is a fundamental principle marking an outer boundary of the trademark monopoly that, although trademark rights may be acquired in a word or image with descriptive qualities, the acquisition of such rights will not prevent others from using the word or image in good faith in its descriptive sense, and not as a trademark. See *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 12–13 (2d Cir.1976); *Sunmark, Inc. v. Ocean Spray Cranberries, Inc.,* 64 F.3d 1055, 1058 (7th Cir.1995); *United States Shoe Corp. v. Brown Group, Inc.,* 740 F.Supp. 196, 198–99 (S.D.N.Y.1990); *Holzwarth v. Hulse,* 14 N.Y.S.2d 181, 181 (N.Y.Sup.1939); *Johnson & Johnson v. Seabury & Johnson,* 71 N.J. Eq. 750, 67 A. 36, 38 (1907); Restatement (Third) of Unfair Competition § 28 (1995); 3A Louis Altman, *Callmann on Unfair Competition, Trademarks and Monopolies* § 21.24 (4th ed.1983); Margreth Barrett, *Intellectual Property* 760–61 (1995). The principle is of great impor-

2000. *See* Def.'s Ex. Q (worksheets itemizing the various costs).

tance because it protects the right of society at large to use words or images in their primary descriptive sense, as against the claims of a trademark owner to exclusivity. *See U.S. Shoe [v. Brown Group, Inc.]*, [740 F.Supp. 196,] 198–199 [S.D.N.Y.1990].

Id. at 269. In short, fair use permits others to use a protected mark to describe aspects of their own goods, provided the use is in good faith and not as a mark. Distilled to its essence, a valid fair use defense involves proof that (1) the allegedly infringing term used by Apple is descriptive of the goods in question; (2) Apple has not used the disputed term as a trademark; *and* (3) Apple has used its mark in good faith. *See DowBrands, L.P. v. Helene Curtis, Inc.*, 863 F.Supp. 963, 968–69 (D.Minn.1994) (emphasis added). Analysis of these three elements involves ground the Court has already covered; however, some discussion is necessary.

### 1. The "OS 9" portion of "Mac OS 9" is a descriptive term

■ Apple argues that the OS 9 portion of Mac OS 9 fairly and in good faith describes the ninth generation of the operating system for its Macintosh line of computers. Microware contends that the time, money, and effort in promoting Mac OS 9 operates to effectively appropriate and capitalize on Microware's trademark. "In this manner," Microware argues, "Apple can transfer secondary meaning and goodwill from product to product."

There's no question that Apple has invested substantial resources in promoting and marketing its newest generation of operating system software. Nor can it be denied, as the Court's earlier discussion makes clear, that the two marks at issue share some similarities. *See supra* at 1213–15. But none of these facts are enough to avoid the conclusion that the "OS 9" portion of "Mac OS 9" is used to describe the ninth version of the Macintosh operating system "Mac OS." *Cf. Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1023 (7th Cir.1979), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980) (the progression of numbers—71B, 72B, 73B, 74B, and 76B—was adopted, and is currently used, to describe the relative sizes of electrical connectors; the numbers are descriptive).

Microware suggests that Apple's promotional efforts are meant in some way to co-opt the good will and reputation of Microware's OS–9 product line. Microware has a validly registered, incontesible trademark in the name "OS–9." It has the right therefore, like all mark holders, to "secure" the "benefits of [its] good reputation," *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)—not, as it now claims, to monopolize a certain combination of letters and a number, *Calvin Klein*, 815 F.2d at 503. ("[T]rademark is not a monopoly on the use of a name or a phrase.") (citation omitted). Recognizing Apple's right to market a product under a name which is descriptive of the ninth generation of its operating software is in no way inconsistent with Microware's right under the trademark laws to reap the good will and reputation of its product name. *See General Mills*, 824 F.2d at 627.

### 2. "OS 9" portion of "Mac OS 9" is not used as a trademark

To succeed on this aspect of the fair use analysis, Apple has to show that the term "OS 9" in "Mac OS 9" is used "otherwise than as a [trade]mark." 15 U.S.C. § 1115(b)(4). "A trademark, or service mark, is an 'attention getting symbol' used basically, and primarily, to make clear to the customer the origin of the goods or the service." *WCVB–TV v. Boston Athletic Ass'n*, 926 F.2d 42, 44 (1st Cir.1991). Although the attention getting aspect of a trademark is key, "the important question is not how readily the mark will be noticed, but whether, when it is noticed, it will be understood as indicating the origin of the goods." *DowBrands*, 863 F.Supp. at 969 (quoting *Chun King Corp. v. Genii Plant Line, Inc.*, 56 C.C.P.A. 740, 403 F.2d 274, 276 (Cust. & Pat.App1968)).

Microware disputes Apple's contention that it does not use the "OS 9" in "Mac OS 9" as a trademark. "Apple's fair use defense must fail as a matter of law," Microware argues, because "Apple plainly uses the Mac OS 9 mark in an attention getting manner." Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 6. Microware argues that "even a cursory examination of Apple's packaging and advertising reveals that Apple uses the Mac OS 9 mark as an attention getting trademark." *Id.*

Plaintiff's argument misapprehends the nature of a trademark. A trademark is not just about a noticeable, attention getting mark. Apple, for example, concedes the number "9" on the packaging of its Mac OS 9 software box is displayed "prominently." [13] Rather, for Microware to succeed on this point, Apple must be guilty of using a mark (here, OS 9) that when noticed, "will be understood as indicating the origin of the goods," *DowBrands*, 863 F.Supp. at 969, namely, Microware or its OS 9 product line. In this case, Apple's use of OS and the number 9 does not serve to indicate Microware or its product line as the source or origin. For Apple, the marks which serve as source indicators are performed by the term "Mac" (which it uses on other Apple products), the registered mark "Mac OS," and the Apple logo—all of which appear on every package of the software. *See Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 395 (2d Cir.1995) (defendant's use of "T50" as part of model designation did not infringe plaintiff's "T-50" mark because it appeared near defendant's logo, which functioned as a "clear and familiar source of origin").

Moreover, and has already been discussed, Apple has put forth evidence to show that OS is an industry convention for denominating the term "operating system." Microware does not deny this common industry practice. Likewise, Apple's choice to follow up Mac OS 8.6 with Mac OS 9 follows the software industry's prac-tice of increasing a version number to denote a major new release. *Cf. National Football League v. Jasper Alliance Corp.*, 16 U.S.P.Q.2d 1212, 1216 (Trademark Tr. & App.Bd.1990) ("The fact that the numeral is different each year is a clear indication that the numeral does not perform a trademark or service mark function because, in order for a designation to perform as a trademark, it must be a constant part of the mark as a whole."). Microware does not deny this numbering practice, except to suggest that Apple chose Mac OS 9 instead of, say, Mac OS 8.7 to capitalize on the good will and reputation of Microware's mark. Given the strong evidence, the Court will not entertain Microware's suggestions that have no basis in the record. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (The non-movant must do more than simply show there is some "metaphysical doubt as to the material facts" because "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no "genuine issue for trial."). Accordingly, the Court finds that Apple does not use OS 9 as a trademark.

### 3. Apple uses "Mac OS 9" fairly and in good faith

The Court finds unconvincing Microware's arguments disputing Apple's good faith in using Mac OS 9. As pointed out earlier, Microware admits there is no evidence to show Apple intended to trade on Microware's good will. *See* Hr'g Tr. of 2/9/00 at 238 (Kaplan cross-examination). By now, it should be abundantly clear that Mac OS 9 is a good faith description of the ninth generation of Apple's operating system for use in its Macintosh personal computer. It was not meant to exploit the good will bound up in Microware's OS 9 product, nor to confuse purchasers. No reasonable jury could conclude otherwise.

---

**13.** *See* Hr'g Tr. of 2/10/00 at 308 (cross-examination testimony of Philip Schiller, Apple's Vice President of world wide product marketing).

### IV. Conclusion

For the above reasons, the Court **denies** Plaintiff's Motion for Preliminary Injunction and **grants** Defendant's Motion for Summary Judgment in its entirety.[14]

IT IS SO ORDERED.

---

14. It may be recalled that the federal portion of Plaintiff's claim contained three counts-trademark infringement, unfair competition, and dilution. The Court's grant of Defendant's motion for summary judgment on fair use, which is by statute effective against an infringement action, 15 U.S.C. § 1115(b), also defeats the federal unfair competition claim, *M.B.H. Enterprises, Inc. v. WOKY, Inc.*, 633 F.2d 50, 52 n. 2 (7th Cir.1980). The Court also finds that on this record no submissible claim exists for Plaintiff's federal dilution claim, 15 U.S.C. § 1125(c), as there is no evidence that Plaintiff's mark has been "tarnished, degraded, or diluted." *Minnesota Mining & Mfg. Co. v. Rauh Rubber, Inc.*, 130 F.3d 1305, 1309 (8th Cir.1997).

Given their similarity with the federal claims, the Court also disposes of Plaintiff's Iowa common law claims of infringement and unfair competition. *See Commercial Savings Bank v. Hawkeye Federal Savings Bank*, 592 N.W.2d 321 (Iowa 1999); *Basic Chem. Inc. v. Benson* 251 N.W.2d 220, 231 (Iowa 1977).