IOWA PAINT MANUFACTURING COMPANY, INC., Plaintiff,

v.

HIRSHFIELD'S PAINT MANUFACTURING, INC., Defendant.

No. 4:03–CV–40451.

United States District Court,
S.D. Iowa,
Central Division.

Dec. 4, 2003.

Donald H Zarley, Zarley Law Firm PLC, Des Moines, IA, for plaintiff.

Edmund J Sease, Jeffrey D Harty, McKee Voorhees & Sease P.L.C., Des Moines, IA, Richard A Kempf, Justin H Perl, Maslon Edelman Borman & Brand LLP, Minneapolis, MN, for defendant.

## ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

GRITZNER, District Judge.

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction. Oral argument on the motion was heard by the Court on November 6, 2003. Attorneys for the Plaintiff are Donald H. Zarley, Timothy J. Zarley, James J. Lynch, Scott. R. Kaspar, and Josef L. Hoffmann, with Mr. Timothy Zarley presenting oral argument in support of the motion; attorneys for the Defendant are Edmund J. Sease, Christine Lebron–Dykeman, Jeffrey D. Harty, Justin H. Perl, and Richard A. Kempf, with Mr. Perl presenting oral argument against the motion.

For the following reasons, the Court finds a preliminary injunction is not warranted under the present circumstances. Therefore, Plaintiff's Motion for Preliminary Injunction will be denied.

## PROCEDURAL HISTORY

The Plaintiff, Iowa Paint Manufacturing Company, Inc. ("Iowa Paint"), commenced this action against the Defendant, Hirshfield's Paint Manufacturing, Inc. ("Hirshfield's"), on August 15, 2003. Jurisdiction is proper pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship and the amount in controversy exceeds $75,000, and under 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a) and (b), as this case arises under the Trademark Laws of the United States, 15 U.S.C. §§ 1051 et seq.

The lawsuit contains two claims arising out of Hirshfield's alleged infringement of a trademark owned by the Plaintiff. The purported trademark at issue is "Pro-Wall". On September 11, 2003, Iowa Paint filed a Motion for Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65. The grounds for this motion are that Defendant's use of the name "Prowall" constitutes unfair competition under 15 U.S.C. § 1125(a), that Plaintiff is likely to succeed on the merits, that Plaintiff has been and will continue to be irreparably injured by Defendant's acts, and the balance of hardships and public interest favor a preliminary injunction. This Motion has been resisted by the Defendant and was the subject of the hearing held on November 6, 2003.

## BACKGROUND FACTS

Iowa Paint has manufactured and sold paint products throughout Iowa and surrounding areas since 1933. The company's products are directed toward professional painting contractors and facilities for maintenance. The company sells its products

through a direct sales force supported by 43 company-operated warehouse stores.

Since 1894, Hirshfield's has manufactured and sold paint products and paint-related goods. Hirshfield's has, until recently, operated approximately twenty-one stores in and around the Minneapolis, Minnesota, area. On July 10, 2003, Hirshfield's opened a store in Urbandale, Iowa.

On or before September 30, 1995, Iowa Paint began using the term "ProWall" in conjunction with its line of paints. Iowa Paint asserts it adopted the "ProWall" name in good faith and without knowledge of any prior use by anyone in the paint industry. Since its adoption, Iowa Paint has used the "ProWall" name in association with paint products throughout the state of Iowa, as well as in parts of Missouri, Kansas, Nebraska, South Dakota, and Illinois.

Meanwhile, in March 1995, Hirshfield's began using the term "Pro-wall" and variants thereof in connection with various paint goods. The use of this term was limited to Minnesota until Hirshfield's opened a store earlier this year in Urbandale, Iowa.[1] Since opening the Urbandale location, Hirshfield's has been in direct competition with Iowa Paint in the paint goods market.[2]

In its motion for preliminary injunction, Iowa Paint moves that the Court grant an order for the following relief:

1. Preliminarily enjoining Defendant, its officers, agents, servants, employees, and attorneys, and any and all persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, from using the name "PRO–WALL" or any other name confusingly or deceptively similar to Plaintiff's name PROWALL for paint goods.

2. Requiring Defendant to immediately cancel and withdraw all advertisements, literature, promotional material, publications, packaging, and displays which have the mark or designation "PRO–WALL" visible on any part thereof used in connection with paint goods.

3. Requiring Defendant to immediately cease and desist from making public statements, presentations, announcements, or declarations referring to the name "PRO–WALL" used in connection with paint goods.

Hirshfield's has asserted numerous reasons why Plaintiff's motion should fail. Hirshfield's argues there is "utterly no likelihood of confusion between the parties' respective paint products and certainly no likelihood of success on the merits of the case at this early stage of the proceedings." These arguments and the requirements for a preliminary injunction, specifically one in a trademark infringement and unfair competition action, are discussed below.

## ANALYSIS

Both parties have submitted briefs with accompanying exhibits and affidavits to support their positions. The Court considered all of these items, along with the arguments presented during the hearing, in making its determination of the propriety of granting Plaintiff's motion.

---

1. At the hearing, it was suggested there may have been some incidental sales in Iowa or South Dakota as a result of the marketing being done in Minnesota; but for purposes of the current motion, the Court regards such sales as immaterial.

2. Additional facts relating to the parties' marks and their use are discussed in the analysis section.

## A. Standard for Preliminary Injunction.

■ Iowa Paint has moved for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65. "A preliminary injunction is extraordinary relief and must be carefully considered." *Books, Inc. v. Pottawattamie County, Iowa*, 978 F.Supp. 1247, 1253 (S.D.Iowa 1997). In deciding a motion for preliminary injunction, the Court considers the following factors:

(1) The probability of success on the merits;

(2) The threat of irreparable harm to the movant;

(3) The balance between this harm and the injury that granting the injunction will inflict on the other interested parties; and

(4) Whether the issuance of an injunction is in the public interest.

*United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1178–79 (8th Cir.1998) (citations omitted); *see Dataphase Sys. Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981); *Microware Sys. Corp. v. Apple Computer, Inc.*, 126 F.Supp.2d 1207, 1211 (S.D.Iowa 2000). These four factors have come to be known as the *Dataphase* factors. *See United Indus. Corp.*, 140 F.3d at 1178–79.

None of these factors is dispositive in itself in determining whether to issue a preliminary injunction. *Id.* at 1179; *see also Calvin Klein Cosmetics v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 667 (8th Cir. 1987). Instead, each factor must be considered in determining "whether the balance of equities weighs toward granting the injunction." *United Indus. Corp.*, 140 F.3d at 1179; *see also Dakota Indus. Inc. v. Dakota Sportswear, Inc.*, 988 F.2d 61, 64 (8th Cir.1993). Moreover, these factors are not to be applied with mathematical precision. *Dataphase Sys., Inc.*, 640 F.2d at 113. Each case is unique and should be determined on its own facts. Therefore, the court's approach needs to "be flexible enough to encompass the particular circumstances of each case." *Id.; see also Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999) ("When applying the *Dataphase* factors, ... 'a court should flexibly weigh the case's particular circumstances ....'") (quoting *United Indus. Corp.*, 140 F.3d at 1179 (citations omitted)).

■ The burden is on the movant to show that a motion for preliminary injunction should be granted. *See Sports Design & Dev., Inc. v. Schoneboom*, 871 F.Supp. 1158, 1163 (N.D.Iowa 1995) (finding "'plaintiff bears the burden of proof concerning the four factors.'") (quoting *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir.1987). This is a heavy burden, *United Indus. Corp.*, 140 F.3d at 1179, especially where "'granting the preliminary injunction will give [the movant] substantially the relief it would obtain after a trial on the merits.'" *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.Supp. 484, 486 (8th Cir.1993) (quoting *Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d 438, 440 (8th Cir.1991)). "Caution must therefore be exercised in a court's deliberation, and 'the essential inquiry in weighing the propriety of issuing a preliminary injunction is whether the balance of other factors tips decidedly toward the movant and the movant has also raised questions so serious and difficult as to call for more deliberate investigation.'" *United Indus. Corp.*, 140 F.3d at 1179 (quoting *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 624–25 (8th Cir.1987)); *see Dataphase Sys., Inc.*, 640 F.2d at 113 ("At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.").

## B. Likelihood of Success

■ The first factor a court considers in determining whether to issue a preliminary injunction is the movant's probability of success on the merits. The Lanham Act[3] serves in part to protect persons engaged in commerce from unfair competition. *United Indus. Corp.*, 140 F.3d at 1179. To prevail under this Act, the plaintiff must prove the defendant's use of a name or mark "creates a likelihood of confusion, deception, or mistake among an appreciable number of ordinary buyers as to source" of the product or the association between the parties. *Duluth News–Tribune v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1096 (8th Cir.1996) (citing 15 U.S.C. § 1114(1) and *General Mills*, 824 F.2d at 626); *Microware Sys. Corp.*, 126 F.Supp.2d at 1211 (citations omitted).

■ To ultimately succeed on the merits of its trademark infringement and unfair competition claims, Iowa Paint will have to demonstrate (1) that its use of the "Pro-Wall" term is entitled to protection and (2) that Hirshfield's use of like terms is likely to confuse consumers as to the source of the product. *See Hubbard Feeds, Inc.*, 182 F.3d at 601. Iowa Paint's Lanham Act claim for false designation of origin also requires a showing of likelihood of confusion. *Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1214 (7th Cir.

1997). The movant does not need to show actual confusion or deceit; rather, it is enough to show the likelihood of confusion or deception. *David Sherman Corp. v. Heublein, Inc.*, 340 F.2d 377, 379 (8th Cir. 1965) (citations omitted). The Court will focus on the likelihood of confusion at this stage of the proceedings.[4]

### 1. The Likelihood of Confusion

In determining whether to grant a motion for preliminary injunction, the Court will look at the movant's mark and whether there is a likelihood of confusion in the nonmovant's use of a similar mark. Iowa Paint maintains "there is a strong likelihood that consumers will be confused as to the source of Defendant's goods ... primarily because of the similarity of the marks used in the sale of identical goods."

■ In determining whether a likelihood of confusion exists, the Court will consider the following factors: "(1) the strength of the trademark; (2) the similarity between the parties' marks; (3) the competitive proximity of the parties' products; (4) the alleged infringer's intent to confuse; (5) evidence of actual confusion; and (6) the degree of care reasonably expected of potential customers." *Duluth News–Tribune*, 84 F.3d at 1096 (citing *Anheuser–Busch, Inc. v. Balducci Publ'ns*, 28 F.3d 769, 774 (8th Cir.1994)); *Dakota In-*

---

**3.** Section 43(a) of the Lanham Act provides in pertinent part:

(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his

or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (2000).

**4.** There has been no contention made relating to the motion for preliminary injunction that the Plaintiff's mark is not entitled to protection.

dus., Inc., 988 F.2d at 64; SquirtCo. v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir.1980). These factors are part of a slightly modified version of Judge Friendly's Polaroid factors, Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1087 (7th Cir.1988) (citing ·Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir.1961)), and are not to be considered using a mathematically precise formula. Duluth News–Tribune, 84 F.3d at 1096. In addition, no one factor is determinative; rather, all of these factors must be weighed and considered by the Court, General Mills, 824 F.2d at 626 (citing SquirtCo., 628 F.2d at 1091), and "the relative weight of the factors depends on the facts of the individual case." First Nat'l Bank in Sioux Falls v. First Nat'l Bank, S.D., 153 F.3d 885, 888 (8th Cir. 1998).

### a. Strength of Mark

■ "Generally speaking, 'strong' marks are afforded broad protection; 'weak' ones get limited protection." Microware Sys. Corp., 126 F.Supp.2d at 1211. This principle applies to all trademarks, regardless of whether they are registered or considered incontestible. See id. (citing General Mills, 824 F.2d at 626 (citing Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 12–13 (2d Cir. 1976))). "Generally, the strength of a mark depends on two factors—the distinctiveness of the mark and the extent to which the mark is recognized by the relevant consumer class." Aveda Corp. v. Evita Mktg., Inc., 706 F.Supp. 1419, 1428 (D.Minn.1989) (citing 2 McCarthy, Trademarks and Unfair Competition 2d § 11:1).

■ "Even if a mark is valid and protectible, it may be so weak that the public is not likely to be confused by the use of a similar mark on other goods and services." See Washington Speakers Bureau, Inc. v. Leading Authorities, Inc., 33 F.Supp.2d

488, 497 (E.D.Va.1999). "Determining that a mark is weak means that consumer confusion has been found unlikely because the mark's components are so widely used that the public can easily distinguish slight differences in the marks, even if the goods are related." General Mills, 824 F.2d at 626.

"Whether a mark is entitled to trademark protection is initially approached by categorizing the mark ...." General Mills, Inc., 824 F.2d at 625. This process of categorization is also helpful in determining the strength and distinctiveness of a mark. Four categories are generally used to determine the relative strength of a mark and the level of protection it is to be afforded. Cellular Sales, Inc. v. Mackay, 942 F.2d 483, 485 (8th Cir.1991). These categories are (1) arbitrary or fanciful; (2) suggestive; (3) descriptive; or (4) generic. Duluth News–Tribune, 84 F.3d at 1096 (citing Cellular Sales, Inc., 942 F.2d at 485).

■ An arbitrary or fanciful mark is considered the strongest type of mark. Id. As a result, this type of mark designation warrants the highest level of protection. Id. "A suggestive mark is one that requires some measure of imagination to reach a conclusion regarding the nature of the product." Id. This type of mark also merits the broad trademark protection without any need to establish a secondary meaning. General Mills, 824 F.2d at 625.

■ "A descriptive mark, on the other hand, immediately conveys the nature and function of the product and is entitled to protection only if it has become distinctive by acquiring a secondary meaning." Duluth News–Tribune, 84 F.3d at 1096. Meanwhile, a generic mark is one used by the general public to identify a category, type, or class of goods. Id.; General Mills, 824 F.2d at 625. It is considered the weakest of the mark desig-

nations and merits no trademark protection, *Duluth News–Tribune*, 84 F.3d at 1096, "because such words are in 'the public domain and available for all to use,' *Hallmark Cards, Inc. v. Hallmark Dodge, Inc.*, 634 F.Supp. 990, 997 (W.D.Mo.1986), and because such terms 'describ[e]˙ not only a particular product or service but also a type or kind of product and service.' *First Fed. Sav. & Loan Ass'n of Council Bluffs v. First Fed. Sav. & Loan Ass'n of Lincoln*, 929 F.2d 382, 383 (8th Cir.1991)." *Cellular Sales, Inc.*, 942 F.2d at 486.

The designation of a mark into one of these categories is important because, as explained by the Eighth Circuit,

> The standard of proof that must be met by the plaintiff in seeking injunctive relief varies depending upon the type of mark at issue. If the mark is the strongest possible mark—an arbitrary or fanciful mark—it is "entitled to maximum legal protection and do[es] not require proof of secondary meaning." If the mark is the weakest protectable mark—a descriptive trademark or trade name—the plaintiff must prove that the mark has an accepted "secondary meaning."

*Id.* (internal citations omitted).

■ Distinctiveness is required for a mark to be eligible for protection. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Distinctiveness may either be inherent or acquired. *Id.* Marks in the trademark categories of arbitrary and fanciful or suggestive are distinct in and of themselves. "Marks which are merely descriptive of a product are not distinctive," but may acquire distinctiveness through a "secondary meaning." *Id.*

■ If a mark imparts information directly then it is considered descriptive. *See Anheuser–Busch Inc. v. Stroh Brewery Co.*, 750 F.2d 631, 641 (8th Cir.1984) (citations omitted). On the other hand, if

the mark stands for an idea that " 'requires some operation of imagination to connect it with the goods, it is suggestive.' " *Id.* (quoting *In re Abcor Dev. Corp.*, 588 F.2d 811, 814 (Cust & Pat.App. 1978)); *see also In re Tennis in the Round Inc.*, 199 U.S.P.Q. 496, 498, 1978 WL 21243 (Trademark Tr. & App. Bd.1978) ("if one must exercise mature thought or follow a multi-stage reasoning process in order to determine what product or service characteristics the term indicates, the term is suggestive rather than merely descriptive"). A determination of the descriptiveness of a mark is determined from the standpoint of the average purchaser. *Anheuser–Busch Inc.*, 750 F.2d at 641 (citing *In re Abcor Dev. Corp.*, 588 F.2d at 814).

■ Descriptive marks can become distinctive if they have acquired a secondary meaning. *Microware Sys. Corp.*, 126 F.Supp.2d at 1213. By acquiring a secondary meaning, a descriptive mark becomes entitled to trademark protection. *Id.* "A descriptive mark may acquire secondary meaning if it has become so associated with the product that it identifies the source of the product and distinguishes the product from those of others." *Id.; see Cellular Sales, Inc.*, 942 F.2d at 486 ("Secondary meaning refers to a mark that 'has become distinctive of the applicant's goods in commerce, i.e., to a mark that consumers associate with a product or distributor rather than with the product itself.' ") (quoting *Best Buy Warehouse v. Best Buy Co.*, 920 F.2d 536, 537 (8th Cir.1990)).

■ Moreover, "[p]laintiff's prior use of its trademark within a given market area entitles it to exclusive use of that mark within that area." *Sweetarts v. Sunline, Inc.*, 380 F.2d 923, 928 (8th Cir.1967). Thus, if the plaintiff has developed a market with a valid, protectable mark, it is entitled to protection within that market. *Id.; see, e.g., Sartor v. Schaden*, 125 Iowa

696, 101 N.W. 511 (1904) (finding Davenport wholesaler of cigars sold under the brand name "SHE" was prevented from entering the Des Moines market where competing manufacturer and wholesaler had gone to expense of building up his trade in Des Moines in the same name ("SHE") prior to Davenport wholesaler's entrance into the Des Moines market in a case of unfair competition).

Another party may have the right to the same or similar mark in a different market area. "However, defendants' right to use the same mark in territory remote from territory developed by plaintiff does not allow defendants to invade the territory already occupied by plaintiff's product." *Sweetarts,* 380 F.2d at 928. A newcomer to the market must enter subject to the rights others have previously acquired. *Id.*

Hirshfield's argues the "ProWall" mark used by Iowa Paint is a weak mark. It asserts that "ProWall" is nothing more than a descriptive mark for which Iowa Paint has offered no evidence of a secondary meaning. Hirshfield's points out the numerous instances where the word "Pro-Wall" or variants thereof have been incorporated into company and product names, including paint products. Accordingly, Hirshfield's argues "ProWall" is a weak mark and that this factor weighs against finding a likelihood of confusion.

Iowa Paint adopted the mark "ProWall" for use with paint goods in the fall of 1995. The adoption of this term was made without any knowledge of prior use by the Defendant or anyone else in the paint industry. Since its inception, Iowa Paint has used this mark by placing it on labels affixed to paint cans, listing paint goods sold under the mark on invoices, and in bids and proposals. Iowa Paint has used this mark continuously in relation to paint goods in all of Iowa and portions of Illinois, Missouri, Kansas, Nebraska, and South Dakota.

Within this region, Iowa Paint has sold in excess of 687,000 gallons of paint under the mark, totaling $5.7 million in sales. These sales were conducted through approximately 38 field sales representatives and 30 company-operated warehouse store locations in the region. The "ProWall" mark is prominently displayed at all of Iowa Paint's locations and is also pushed in customer calls. Iowa Paint estimates it has well over 500,000 transactions per year at its stores, or approximately four million transactions since inception of the "ProWall" mark, in addition to making 50,000 customer calls annually, or almost 400,000 calls in the last eight years. As a result, Iowa Paint argues its "customers have come to identify Iowa Paint as the sole source of quality paint products under the mark PRO-WALL." Over this time, it is likely the "ProWall" mark has come to be recognized by the relevant consumer class. Accordingly, the "ProWall" mark used by Iowa Paint has achieved distinctiveness in the area where it is marketed and sold. Even if not a suggestive mark, it has achieved a "secondary meaning."[5] In short, "Pro-Wall" is a strong mark in the relevant market area.[6] Thus, this factor weighs in favor of finding a likelihood of confusion.

5. The Court does not place Iowa Paint's "Pro-Wall" mark into a specific category at this time. This is unnecessary to the Court's finding that the mark is a strong mark. The Court does recognize that the mark would be categorized as either a suggestive mark or a descriptive mark that has achieved a secondary meaning.

6. Meanwhile, Hirshfield's "Pro-wall" mark is a weak mark in the relevant market area. This is important when considering the other factors used in determining whether a likelihood of confusion exists.

### b. Similarity Between Marks

 A court "must evaluate the impression that each mark in its entirety is likely to have on a purchaser exercising the attention usually given by purchasers of such products." *Duluth News–Tribune,* 84 F.3d at 1097 (citing *General Mills,* 824 F.2d at 627). "The use of identical, even dominant, words in common does not automatically mean that two marks are similar." *General Mills,* 824 F.2d at 627. However, exact similitude of the two marks is not required for a finding of likelihood of confusion. *See Washington Speakers Bureau, Inc.,* 33 F.Supp.2d at 497 ("absolute identity is not necessary for infringement"). In fact, "all that is necessary is enough similarity between the marks to confuse consumers." *Id.; see, e.g., David Sherman Corp.,* 340 F.2d at 380 ("Some dissimilarity in form and color is not conclusive against infringement.").

"[I]n analyzing the similarities of sight, sound, and meaning between two marks, a court must look to the overall impression created by the marks and not merely compare individual features." *General Mills,* 824 F.2d at 627. "In fact, the whole point of the inquiry turns on whether the 'overall impression' created by the marks are such that a likelihood of consumer confusion will result." *Microware Sys. Corp.,* 126 F.Supp.2d at 1214 (citing *General Mills,* 824 F.2d at 627).

Therefore, the Court will "consider the marks' visual, aural, and definitional attributes and compare the trade dress of the products in determining whether the total effect conveyed by the two marks is confusingly similar." *Luigino's, Inc. v. Stouffer Corp.,* 170 F.3d 827, 830 (8th Cir.1999). "However, caution should be exercised to avoid putting too much stock in a subjective inspection done in-chambers that is devoid of market characteristics." *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.,* 815 F.2d 500, 504 (8th Cir.1987) (citing *Beer Nuts, Inc. v. Clover Club Foods Co.,* 711 F.2d 934, 941–42 (10th Cir.1983)); *see also Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1187 (6th Cir.1988) (finding "side-by-side" comparison is not the test to determine similarity) (quoting *Levi Strauss & Co. v. Blue Bell, Inc.,* 632 F.2d 817, 822 (9th Cir.1980)); *James Burrough Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266, 275 (7th Cir.1976) (finding "side-by-side" comparison is not the test to determine similarity particularly when the consuming public will never have the opportunity for such a comparison).

Instead, a court "must attempt to recreate the conditions in which buying decisions are made, and ... what a reasonable purchaser in market conditions would do." *Lenox Labs., Inc.,* 815 F.2d at 504; *see also James Burrough Ltd.,* 540 F.2d at 275. Where the public does not encounter the marks together, "it is inappropriate to focus on minor stylistic differences in determining the likelihood of confusion caused by the defendant's use of the allegedly infringing name." *Int'l Kennel Club of Chicago, Inc.,* 846 F.2d at 1088 (citing *Sun–Fun Prods., Inc. v. Suntan Research & Dev., Inc.,* 656 F.2d 186 (5th Cir.1981) ("the inability to compare the [marks] side-by-side and observe the precise difference in appearance may increase the likelihood of confusion.")).

 "Where the products are closely related, less similarity of the trademarks is necessary to support a finding of infringement." *SquirtCo.,* 628 F.2d at 1091; *see also Century 21 Real Estate Corp. v. Century Life of America,* 970 F.2d 874, 877 (Fed.Cir.1992) ("When marks would appear on virtually identical goods or services, the degree of similarity necessary to support a conclusion of likely confusion declines.") (citations omitted). Furthermore, where "marks use identical language to sell a nearly identical service, the likeli-

hood of confusion must be considered great." *Wynn Oil Co.*, 839 F.2d at 1190–91. However, confusion is not automatically likely where a junior user has a mark that contains in part the whole of another's mark. *See, e.g., Colgate–Palmolive Co. v. Carter–Wallace, Inc.*, 58 C.C.P.A. 735, 432 F.2d 1400, 1402 (Cust. & Pat.App.1970) (finding "PEAK PERIOD" not confusingly similar to "PEAK" as used in very different products).

Where the dominant portions of marks is the same, confusion is more likely. *See, e.g., In re El Torito Rests., Inc.*, 9 U.S.P.Q.2d 2002, 2004, 1988 WL 252343 (Trademark Tr. & App. Bd.1988) (finding MACHO COMBOS mark is likely to be confused with MACHO mark because of the similarity of the marks and because the goods and services are virtually the same). However, a court can still find confusion where the disputed mark is not the most prominent feature. *See Massey Junior College v. Fashion Inst. of Technology*, 492 F.2d 1399, 1402 (Cust. & Pat.App. 1974) (finding that conflicting marks need to be analyzed in their entirety even when sharing a prominent feature).

■ The use of the company name, or house mark, may decrease the likelihood of confusion. *See, e.g., Luigino's, Inc.*, 170 F.3d at 831 (finding that "[t]he use of different colors and typefaces, as well as the prominent display of the house marks, convey perceptible distinctions between the products."); *Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1566–68 (Fed.Cir.1994) (applying Eighth Circuit law and finding prominent placement of logos on front of the products decreases likelihood of confusion); *General Mills*, 824 F.2d at 627 (finding the use of house marks in a prominent manner may enable consumers to distinguish between two products); *Pristine Indus., Inc. v. Hallmark Cards, Inc.*, 753 F.Supp. 140, 145–46 (S.D.N.Y.1990) (denying motion for prelim-

inary injunction and finding the use of defendant's well-known house mark with the disputed mark is a strong factor pointing to a finding of no likely confusion); *Worthington Foods, Inc. v. Kellogg Co.*, 732 F.Supp. 1417, 1441 (S.D.Ohio 1990) (denying motion for preliminary injunction and finding "the display of a company's own familiar mark on a product reduces the likelihood of confusion which might stem from the simultaneous use of another's mark").

However, even if a consumer attaches importance to the defendant's house mark, the consumer may believe the plaintiff had licensed, approved, or otherwise authorized this use of the plaintiff's trademark. *See, e.g., Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 876 (2d Cir.1986) (noting that labeling does not prevent consumers from mistakenly assuming the parties are somehow associated or that plaintiff had consented to the defendant's use of the mark); *A.T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689, 692 (2d Cir.1972) ("a purchaser could well think plaintiff had licensed defendant as a second user").

Here, the marks "ProWall" and "Prowall" are virtually identical. In addition, both are used in conjunction with paint goods and, more specifically, on cans of paint sold by the parties. However, the Court does not look at the marks in isolation, but rather as part of the entire trade dress of the products. Furthermore, the Court recognizes that the parties' paint products are not usually found on store shelves. Instead, the paint is kept in warehouse stores that cater to professional paint contractors. As a result, potential purchasers are not presented with the parties' products side-by-side.

Both Iowa Paint and Hirshfield's sell their products to commercial and individual consumers. In most cases, a sales rep-

resentative calls on a contractor and submits a bid proposal. In other cases, the painting contractor comes into the warehouse store. When placing orders, some customers refer to SKU or product number, while others refer to the product by name.

Hirshfield's points out that in looking at its trademarks and trade dress as a whole, there are at least four distinct parts: (1) the distinctive Hirshfield's design logos; (2) the trade name Hirshfield's; (3) the names of its paint lines, including "Professional Coatings", "Wash and Wear", and "Top Scrub"; and (4) the Hirshfield's Paint grades designated as "Pro-wall 2000/4000/6000" and "ProWall 1000 Series". In addition, the product number or SKU is also found on every label.

In addition, Hirshfield's argues that the terms "Pro-wall 2000/4000/6000" are grade designations that "are used to differentiate one product grade within a line of paint from the others, not to distinguish them from the goods of other paint manufacturers." It states that it adopted the grade designations so that professional paint buyers could understand the different grades of professional paints.

A grade designation does not achieve the stature of a trademark unless it serves to distinguish a company's products from the goods or services of others. *In re Armco Steel Corp.*, 127 U.S.P.Q. 135, 136 (Trademark Tr. & App.Bd.1960); *see also Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 392 (2d Cir.1995); *J.M. Huber*

*Corp. v. Lowery Wellheads, Inc.*, 778 F.2d 1467, 1469 (10th Cir.1985). However, for a mark to be found merely descriptive as a grade designation, it must be used *solely* as a grade designation and not in *any* source-indicating function. *Eastman Kodak Co. v. Bell & Howell Document Mgmt. Prods. Co.*, 994 F.2d 1569, 1576 (Fed.Cir. 1993). Hirshfield's argues it uses the "Pro-wall" mark as part of grade designations of its paint and not in any source-indicating manner; therefore, its use of the mark "Pro-wall" cannot serve as a trademark.

However, the issue is not whether Hirshfield's has a trademark, but rather whether Iowa Paint has a trademark deserving of protection. If Iowa Paint does have a valid protectable trademark, then the issue becomes whether Hirshfield's use of its mark, whether or not it constitutes a valid trademark,[7] is similar enough to Plaintiff's mark to confuse consumers of the parties' products.

Hirshfield's also contends that if the Court finds Hirshfield's grade designations are in fact part of its trademark and trade dress, "it is clear that Hirshfield's logos, trade name, and product names prominently featured on its products in superior positions and in larger stylized type fonts substantially reduce any likelihood of confusion." Based solely on a side-by-side comparison of the parties' respective paint can labels, the Court agrees. However, as previously indicated, purchasers of the parties' paint goods will not see the prod-

---

7. Hirshfield's does have a valid trademark for the name "Pro-wall", at least in Minnesota. It has registered versions of this mark in Minnesota. *See* Minn. Reg. Nos. 23682, 23683, and 236884. This trademark is valid and protectable in Minnesota. *See* Minn.Stat. § 333.43. These registrations seem to directly contradict Hirshfield's assertion that its mark is used only as a grade designation.

Furthermore, this assertion is inconsistent with Hirshfield's actual use of the mark as

evidenced by its listing "Pro-wall" on bid proposal sheets under the heading "Product Name" along with other admitted marks "Wash & Wear" and "Top Scrub". In addition, the PROMAR mark, upon which Hirshfield's claims to have based its grade designation, has been federally registered by Sherwin Williams as a trademark and not a grade designation.

ucts side-by-side, and, therefore, this is not the test. Rather, the Court will attempt to recreate market conditions.

Where general references are made to "ProWall" in oral communication, i.e., calls to customers by a sales representative, confusion may be likely as it is not clear which company is the manufacturer of the product in question. In addition, in submitting bid proposals, Defendant has listed the "Pro-wall" term under the heading of "Product Name". Beyond this, confusion is unlikely, especially when considering the average purchaser of the parties' products. The average purchaser, i.e., the professional paint contractor, is aware of the different manufacturers and knows which one he is dealing with.

Iowa Paint also points out that a majority of commercial sales are for new home construction. When a paint project is completed, the painter will often leave a paint can in the garage of the new home. This is done so if the new homeowner wishes to repaint or do touch-up work, they know which paint was used. The homeowner can then place orders for additional paint. The label on Iowa Paint's cans prominently displays the "ProWall" mark. Thus, a new homeowner that wishes to buy more paint may rely on the "ProWall" mark in seeking to find the paint manufacturer. The Court finds this situation will rarely result in confusion between the products due to the prominent placement of the house marks on the cans of paint.

▮▮▮ The parties use nearly identical marks ("ProWall" versus "Pro-wall") on the same type of goods (paint). However, the Court finds these marks are not similar enough to be confusing when considered in the manner in which these products are purchased. Both Iowa Paint and Hirshfield's market their product to the professional paint contractor. This buyer is aware of the paint manufacturer when it goes to purchase the paint, and the manufacturer's name is prominently displayed on the paint can labels, the store front, any advertisements, and all bid offer sheets. Moreover, this buyer will focus more on the specific product name, i.e., "ProWall" for Iowa Paint and "Professional Coatings" for Hirshfield's. Hirshfield's use of the "Pro-wall" mark is secondary to the product name. It does function as a grade designation in a way dissimilar to Iowa Paint's use of its "ProWall" mark. Iowa Paint has failed to establish sufficient similarity between the marks in issue; therefore, this factor weighs against a finding of likelihood of confusion.

### c. Degree of Competition/Competitive Proximity

▮▮▮ This factor is important in determining whether consumers will be confused as to the source of the product. A high competitive proximity in location and product type may serve to increase the likelihood a purchaser could believe the products come from or are affiliated with the wrong source. *See, e.g., Wynn Oil Co.,* 839 F.2d at 1187 (finding consumer could easily assume producer of car wash products had expanded into car wash business). As discussed above, Iowa Paint and Hirshfield's are both in the same relevant market area. Furthermore, there is no dispute that they are direct competitors in the paint goods market. They are using similar channels of distribution. For example, Hirshfield's representatives have made sales calls to customers of Iowa Paint and have submitted price quotes for various paints under the Pro-wall mark. Hirshfield's does argue that there is no evidence the sales generated by Hirshfield's one Iowa store are taking sales away from Iowa Paint because of Hirshfield's use of the mark "Pro-wall" in conjunction with its paint goods. However, this is not the standard under this factor.

Therefore, based on the competitive proximity of the parties since Hirshfield's opened its Urbandale store, this factor weighs in favor of a finding of likelihood of confusion.

#### d. Intent of Alleged Infringer

 The intent of the alleged infringer to "pass off" its product as that of another serves to raise an inference of the likelihood of confusion. *SquirtCo.*, 628 F.2d at 1091. This intent is not, however, a required element for a finding of infringement. *Id.* There is little evidence that Hirshfield's had a predatory intent in using the "Pro-wall" mark. In fact, Hirshfield's adopted its mark approximately six months prior to Iowa Paint's adoption of its mark.

The Court does recognize that a newcomer to a market may wish to capitalize on another's mark even if the newcomer has attained rights to that mark in another market. In addition, adoption of a similar mark may lead to an inference of an intent to "pass off", particularly when there is a prior relationship. *Beer Nuts, Inc.*, 805 F.2d at 927. However, Iowa Paint has offered little evidence that Hirshfield's has done this.

As its only evidence of Hirshfield's bad faith in using the "Pro-wall" mark, Iowa Paint points out that "Hirshfield's entered the market after hiring as its store manager a former Iowa Paint employee who has shared substantial confidential proprietary information . . . ." Additionally, Iowa Paint points to Hirshfield's continued insistence on using the mark even though it claims the mark has no value as evidence that Hirshfield's wishes to benefit from the goodwill of Iowa Paint's mark. Iowa Paint does not address the fact that Hirshfield's has used its mark in Minnesota for longer than Iowa Paint has used the "ProWall" mark in the relevant market area. It is reasonable that a company will bring its existing goods with it when entering a new market. Thus, this factor weighs against a finding of likelihood of confusion necessary to the granting of the motion for preliminary injunction.

#### e. Actual Confusion

 " 'When determining whether there exists a likelihood of confusion, weight is given to the number and extent of instances of actual confusion.' " *Duluth News–Tribune*, 84 F.3d at 1098 (quoting *Life Technologies, Inc. v. Gibbco Scientific, Inc.*, 826 F.2d 775, 777 (8th Cir.1987)). This is because "[e]vidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Wynn Oil Co.*, 839 F.2d at 1188.

The absence of actual confusion has been considered an important factor. *David Sherman Corp.*, 340 F.2d at 380; *cf. Wynn Oil Co.*, 839 F.2d at 1188 ("it does not follow that lack of evidence of actual confusion should be a significant factor"). Proof of actual confusion, however, "is not essential to a finding of trademark infringement." *SquirtCo.*, 628 F.2d at 1091. In fact, "[t]he plaintiff is not required to prove any instances of actual confusion," *Aveda Corp.*, 706 F.Supp. at 1430 (citing *E. Remy Martin & Co., S.A. v. Shaw–Ross Int'l Imports, Inc.*, 756 F.2d 1525 (11th Cir.1985), and *David Sherman Corp.*, 340 F.2d 377), as clear and substantial proof of actual confusion is difficult to produce. *See Wynn Oil Co.*, 839 F.2d at 1188 (quoting *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 914 (Fed.Cir.1984)).

Iowa Paint has not produced any evidence of actual confusion in this case. Those usually buying these products are professional paint purchasers that are unlikely to be confused. Moreover, even retail purchasers are unlikely to be confused because the parties' products are never displayed in the same store, let alone on

the same shelf. Also, the Hirshfield's Urbandale store has only been open for a relatively short period of time, not enough time for much actual confusion to occur. Consequently, this factor weighs against a finding of likely confusion.

### f. Degree of Care/Sophistication of Buyers

In evaluating this factor, a court looks to the degree of care expected of an ordinary purchaser of this product. *Duluth News–Tribune*, 84 F.3d at 1099. Stated another way, this factor looks at "whether the degree of care exercised by the consumer can eliminate a likelihood of confusion that otherwise would exist." *Microware Sys. Corp.*, 126 F.Supp.2d at 1211. "In determining the role of the consumer, courts 'must stand in the shoes of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods.' " *Id.* at 1217 (quoting *Luigino's, Inc.*, 170 F.3d at 831). " '[T]he kind of product, its cost and the conditions of purchase are important factors in considering whether the degree of care exercised by the purchaser can eliminate the likelihood of confusion which would otherwise exist.' " *SquirtCo.*, 628 F.2d at 1091 (quoting *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir. 1975)); *see, e.g., First Nat'l Bank in Sioux Falls*, 153 F.3d at 889–90 (finding consumers tend to exercise a high degree of care in selecting banking services; therefore, the usual customer is more likely to notice relatively minor differences in bank names).

Hirshfield's argues the ordinary purchaser standard the Court should use is that of professional paint contractors. Professional paint contractors are sophisticated buyers and are aware of the different major national and regional paint manufacturers. Hirshfield's asserts that such paint purchasers select a manufacturer, a product number or SKU, and a type and color when purchasing paint. As a result, such purchasers "are not likely to be confused over the source of a product by the subordinate use of a common and descriptive term such as 'Pro-wall' on the label."

Professional paint buyers generally order paint directly from a specific manufacturer. Hirshfield's argues that these purchasers already know the product they want to purchase before they even contact the manufacturer. While Hirshfield's asserts that few professional paint contractors order paint by the actual name of the product,[8] Iowa Paint claims it does receive many orders by product name for its "Pro-Wall" paint.

Hirshfield's sells 83 percent of its Hirshfield's brand paints to professional painting contractors.[9] Of this amount, 30 percent bear the "Pro-wall 2000/4000/6000" mark or similar designation.[10] Hirshfield's Urbandale store caters to professional painting contractors and sells to them at wholesale prices. It is not a typical retail store and does not keep much paint on the show floor. In fact, Hirshfield's states that its "Pro-wall" designated paint cannot even be found on the shelves. As a result, Hirsh-

8. Hirshfield's asserts these purchasers have specific knowledge of paint such that they buy the paint goods by SKU or product number.

9. While these numbers are based on the overall sales for Hirshfield's, the only record currently available to the Court suggests the breakdown in percentage of wholesale and retail sales at the Urbandale location are approximately the same.

10. Hirshfield's "Professional Coatings" line of paint carries these designations. This paint product is sold almost exclusively to professional paint buyers.

field's maintains that a professional paint contractor or retail purchaser knows he is dealing with Hirshfield's when he enters the store. Furthermore, a purchaser seeking to buy any Hirshfield's paint product bearing the designation "Pro-wall" on the label must specifically request that paint.

Likewise, Iowa Paint's "ProWall" labeled paints are directed toward the professional painting contractor. More than 90 percent of its total sales are to professional paint contractors, while less than 10 percent constitute retail sales.[11] Retail customers rarely purchase Iowa Paint's "ProWall" paint as this product is primarily for the professional paint contractor. Like Hirshfield's practice, Iowa Paint does not display its "ProWall" paint on the show floor of its stores. In fact, retail sales of Iowa Paint's "ProWall" accounted for approximately one percent of its total retail paint sales.[12] Iowa Paint's "Pro-Wall" line has a limited selection of colors and is sold primarily to painters of newly constructed homes because they are typically very price sensitive.

Iowa Paint contends that Hirshfield's proposes the incorrect standard for the degree of care. Iowa Paint argues that "where the products are identical and the marks are identical, the sophistication of the buyers cannot be relied on to prevent confusion." *McGregor–Doniger Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1137 (2d Cir. 1979) (superseded by rule on another issue

as stated in *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1044 (2nd Cir.1992)).[13] In this case, the marks are similar, but not identical, and are displayed in markedly different ways in the entire trade dress. Thus, under the circumstances of this case, the sophistication of the buyers does impact the potential for confusion.

Iowa Paint argues the unsophisticated homeowner is the purchaser that should be considered. Both parties sell their products to knowledgeable professionals and to retail consumers. Iowa Paint also points out that one judge observed that "magazine purchasers have a degree of sophistication or selection know-how which does not necessarily exist in the selection *of a can of beans or paint.*" *In re Simulations Publ'ns, Inc.*, 521 F.2d 797, 799 (Cust. & Pat.App.1975) (emphasis added).

However, when the buying class is made up exclusively of professional, commercial purchasers, it is presumed that this type of purchaser is the relevant class. *See, e.g., Arrow Fastener Co.*, 59 F.3d at 398–99 (finding sophisticated purchaser was the proper standard); *Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1206–07 (1st Cir.1983) (finding relevant inquiry is "the sophistication of the class of prospective purchasers of the subject products" and purchasers here were highly sophisticated); *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 888 F.Supp. 192, 200 (D.Me.1995), *aff'd,* 97

---

**11.** These numbers come primarily from the Affidavit of John Poortinga. Poortinga is currently the store manager of Hirshfield's Urbandale location. Prior to this, he was employed by Iowa Paint for nearly 17 years, 12 of which were as a store manager.

**12.** "ProWall" is a third or fourth tier product line. Homeowners usually purchase from the high-end paint products manufactured by Iowa Paint such as its "Iowa Paint Platinum Series" and "Iowa Paint Masters Series"

paint. lines. These products do not contain the name "ProWall" anywhere on their packaging.

**13.** Other courts have found the sophistication of buyers can overcome very minor differences on identical products or services. *See, e.g., First Nat'l Bank in Sioux Falls*, 153 F.3d at 889–90 (finding consumers are sophisticated and therefore more likely to notice relatively minor differences in bank names).

F.3d 1504 (1st Cir.1996) (finding sophisticated commercial purchaser was the proper standard); 3 J. McCarthy, *Trademarks and Unfair Competition* § 23.100 (4th ed.2003). These purchasers are usually more sophisticated and therefore less likely to be confused than the ordinary consumer. *Astra Pharm. Prods., Inc.,* 718 F.2d at 1206–07. When a product is sold to both less knowledgeable consumers and professionals, the court does, however, need to recognize that "the trademark law protects the entire gamut of purchasers .... " *Country Floors, Inc. v. Partnership of Gepner and Ford,* 930 F.2d 1056, 1066 (3d Cir.1991).

The Court finds the "ordinary purchaser" is the professional painting contractor. Only a very low percentage of paint bearing Iowa Paint's "ProWall" mark or Hirshfield's "Pro-wall" mark is actually sold to retail consumers. Instead, the vast majority of purchasers, i.e., the ordinary purchaser, is the professional paint contractor in this case. The standard for such buyers is that they have a certain level of sophistication and will be less likely to be confused. Professional paint contractors would be expected to exert a relatively high degree of care in selecting their paint. Nothing in this record suggests that professional paint contractors are unaware of what paint manufacturer they are dealing with when in the process of purchasing paint. Nor does the record suggest professional paint contractors would be unaware of new entrants into the relevant market area and any association with existing paint manufacturers in the area. As a result, the Court finds this factor further weighs against a finding that a likelihood of confusion exists.

■ Based on the foregoing, Iowa Paint has failed to show a likelihood of confusion sufficient to show a probability of success on the merits.[14] There is not a sufficient degree of similarity between the marks *as they are used in the marketplace.* Furthermore, the average consumer is the sophisticated professional paint contractor that is unlikely to be confused under these circumstances. Taken together, along with the other factors discussed, the Court finds at this point in the case there is no likelihood of confusion.

### C. Irreparable Harm

■ The second factor a court considers in determining whether to issue a preliminary injunction is the threat of irreparable harm to the movant. Irreparable injury or harm to the movant can be presumed from a finding of probable success in proving likelihood of confusion. *Lenox Labs., Inc.,* 815 F.2d at 505 (citing *Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.,* 633 F.2d 746, 753 (8th Cir.1980)). "In an action for trademark infringement, 'the only irreparable harm the plaintiff need show is that there is a likelihood of confusion and, therefore, infringement of its mark.'" *Aveda Corp.,* 706 F.Supp. at 1431 (quoting *Penthouse Int'l, Ltd. v. Penthouse Party & Travel Club, Ltd.,* 184 U.S.P.Q. 479, 481 (E.D.Mich.1974)). This is in part because trademark infringement damages are by their nature difficult to quantify and remedy. *See General Mills,* 824 F.2d at 625 ("Since a trademark represents intangible assets such as reputation and goodwill, a showing of irreparable injury can be satisfied if it appears that [movant] can demonstrate a likelihood of consumer confusion.").

■ There is no requirement that the plaintiff suffer economic disadvantage or financial harm. *James Burrough Ltd.,* 540

---

**14.** The Court notes that this determination is preliminary and does not affect the eventual outcome of the case on the merits.

F.2d at 275. "Though economic harm per se is not required, ... the owner of the mark is damaged by a later use of a similar mark which places the owner's reputation beyond its control, though no loss in business is shown." *Id.* at 276; *see also Citibank N.A. v. City Bank of San Francisco*, 206 U.S.P.Q. 997, 1007 (N.D.Cal. 1980) ("Loss of business is not the test of irreparable injury in motions for preliminary injunctions against the use of a trademark. The fact that Plaintiff has had the symbol of its reputation placed in the hands of another is irreparable injury.").

In a trademark infringement action, damage to reputation and goodwill are often present. This may come as a result of consumer confusion over the source of goods of inferior quality. By improperly attributing the source of the goods to the plaintiff, the plaintiff's business reputation can be severely damaged. *See Hills Bros. Coffee, Inc. v. Hills Supermarkets, Inc.*, 428 F.2d 379, 381 (2d Cir.1970) (finding that "[u]nless a preliminary injunction is issued ..., the appellant would suffer the prospect of serious dilution of its mark by purchasers buying appellee's coffee by mistake ..., thereby placing [appellant's] sales and reputation in danger pending the final outcome of the trial."). While such an injury is real, it is often difficult to measure in money damages. As the Second Circuit stated,

> When there is, then, such high probability of confusion, injury irreparable in the sense that it may not be fully compensable in damages almost inevitably follows. While an injured plaintiff would be entitled to recover the profits on the infringing items, this is often difficult to determine; moreover, a defendant may have failed to earn profits because of the poor quality of its product or its own inefficiency. Indeed, confusion may cause purchasers to refrain from buying either product and to turn to those of other competitors. Yet to prove the loss of

sales due to infringement is also notoriously difficult. Furthermore, if an infringer's product is of poor quality, or simply not worth the price, a more lasting but not readily measurable injury may be inflicted on the plaintiff's reputation in the market.

*Omega Importing Corp. v. Petri–Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971) (reversing order denying preliminary injunction) (internal citations omitted). However, "only a clear showing of confusion generates the presumption of irreparable harm." *Minn. Mining & Mfg. Co. v. Rauh Rubber, Inc.*, 943 F.Supp. 1117, 1133 (D.Minn.1996).

Thus, "courts may also consider the potential loss of control over the quality of plaintiff's product and the risk of damage to a plaintiff's reputation and trademark from the continued use of an infringing mark." *Minn. Mining & Mfg. Co.*, 943 F.Supp. at 1133. This harm must, however, be more then merely speculative. *See United Indus. Corp.*, 140 F.3d at 1184 ("irreparable harm cannot be presumed where, as here, plaintiff has not established any prospect of success on the merits."); *Sports Design & Dev., Inc.*, 871 F.Supp. at 1164 (" 'Possible or speculative harm is not enough.' ") (quoting *Bloom v. O'Brien*, 841 F.Supp. 277, 279 (D.Minn. 1993)). Moreover, in the absence of a likelihood of confusion, it is extremely difficult to make a finding of irreparable harm, particularly where there is no showing of economic or financial loss. *See Microware Sys. Corp.*, 126 F.Supp.2d at 1218 (citing *United Indus. Corp.*, 140 F.3d at 1183–84).

Iowa Paint asserts that it has made a substantial investment to develop its goodwill and reputation in the mark. It asserts this reputation consists of providing quality goods, reliable and dependable service, and competitive pricing. It has done this

through eight years of advertising and selling paint goods under the "ProWall" mark. In addition, Iowa Paint has contributed its paint products to non-profit organizations to assist in fund raising and facility maintenance projects. Iowa Paint argues that it has unwillingly had its reputation placed in the hands of another through Hirshfield's use of a virtually identical mark. Plaintiff maintains that it essentially has lost control of its reputation.

Iowa Paint argues that without a preliminary injunction it will suffer irreparable harm by Hirshfield's use of its mark. In addition, Iowa Paint argues it will lose the benefit of "ProWall" as a mark that functions as a distinctive identifier of Iowa Paint and its paint goods. This will diminish the value of the mark, and any reestablishment of that value will be difficult if not impossible to achieve. *See, e.g., Citibank N.A.,* 206 U.S.P.Q. at 1007 (quoting *Louis Rich, Inc. v. Horace W. Longacre, Inc.,* 423 F.Supp. 1327, 1335 (E.D.Pa.1976)). Moreover, Iowa Paint may also suffer damage to its reputation and goodwill.

Hirshfield's argues that there is no likelihood of confusion under the circumstances presented in this case and, hence, no irreparable harm. Iowa Paint has made no showing of economic or financial loss here. Thus, Iowa Paint must show a likelihood of confusion for this factor to weigh in favor of issuing the preliminary injunction. Based on the foregoing discussion, Iowa Paint has not established a likelihood of confusion. Consequently, the threat of irreparable harm is not presumed.

Furthermore, the threat of irreparable harm is limited under these circumstances as Hirshfield's is a new entrant and is only operating one store in the relevant market area. Iowa Paint, on the other hand, is a well-known participant in the relevant market area, and any potential confusion will likely inure for its own benefit.[15] Thus, the Court finds there is no significant threat of irreparable harm by the continued use of the "ProWall" mark by Hirshfield's.

If the plaintiff is unable to show a likelihood of success on the merits or the threat of irreparable injury, the third and fourth *Dataphase* factors are insufficient on their own to support a preliminary injunction. *Microware Sys. Corp.,* 126 F.Supp.2d at 1218–19. As detailed above, Iowa Paint has failed to establish either a likelihood of confusion or threat of irreparable injury. Thus, even if Iowa Paint establishes the following factors are in its favor, it will not be enough to support granting the preliminary injunction. However, as discussed below, the Court did consider these factors and finds they do not weigh in Iowa Paint's favor at this time.

### D. Balance of Harms

The third factor a court considers in determining whether to issue a preliminary injunction is the balance between the potential harm to the movant and the injury that granting the injunction will inflict on the other interested parties, otherwise known as the balance of harms. *See Sports Design & Dev., Inc.,* 871 F.Supp. at 1165. This element encompasses the determination of whether "the harm to the moving party outweighs the financial loss and damage to the reputation of the nonmoving party." *Aveda Corp.,* 706 F.Supp.

---

**15.** For example, Iowa Paint argues that a potential consumer is the new homeowner that has a can of paint left in its garage by the paint contractor. Were this individual to call up a paint contractor or store in the area and ask for "ProWall" paint based on the can's label, the paint contractor will most likely sell the paint manufactured by Iowa Paint due to its reputation in the area as the producer of "ProWall" paint regardless of whether the paint in the can left in the garage was actually manufactured by Iowa Paint.

at 1431 (citing *Nat'l Bd. of YMCA v. Flint YMCA,* 764 F.2d 199 (6th Cir.1985)). "This factor requires the Court to consider any possible harm to the defendant from granting a preliminary injunction and to balance it with the harm to the plaintiff if the plaintiff is denied preliminary relief, but is later successful on the merits." *Minn. Mining & Mfg. Co.,* 943 F.Supp. at 1133. "Where the moving party has made a substantial investment developing its trademark relative to the nonmoving party's investment in the allegedly infringing mark, the courts generally find that the moving party's hardship outweighs that of the nonmoving party." *Aveda Corp.,* 706 F.Supp. at 1431 (citations omitted). The potential loss to the moving party may include loss of trade, sales, reputation, and goodwill, some of which may never be remedied with money damages. *Id.; Minn. Mining & Mfg. Co.,* 943 F.Supp. at 1133. The court will also look at size of the parties' relative investment. *Aveda Corp.,* 706 F.Supp. at 1431.

Iowa Paint argues that an injunction in its favor will serve to prevent continued loss of goodwill in its name, injury to its reputation, and the loss of control over its name and reputation. These harms cannot be adequately compensated through monetary relief. *See Minn. Mining & Mfg. Co.,* 943 F.Supp. at 1133. In addition, Iowa Paint argues that it has spent eight years building its reputation in the "Pro-Wall" name at substantial investment.

Meanwhile, Iowa Paint asserts that the harm to the Defendant is relatively small, as Hirshfield's will not be prevented from selling other paint in the relevant market area.[16] *See, e.g., Sports Design & Dev., Inc.,* 871 F.Supp. at 1165 (finding that restraining order would not prevent defendant from producing or selling other types

of fishing lures or otherwise conducting business weighed in favor of granting the order). Defendant could also continue to sell the paint that is currently labeled with the Pro-wall mark at little cost by printing and attaching new labels that are devoid of the allegedly infringing terms.

Iowa Paint fails to recognize the costs to Hirshfield's that would be associated with a preliminary injunction. There would be the admitted cost of changing advertising and labeling. In addition, because Hirshfield's operates primarily out of Minnesota, there would be logistical costs associated with supplying non-"Pro-wall" branded paint solely to one location. These costs would include storage and transportation costs along with the difficulty of keeping the stock separate. Moreover, Hirshfield's is a fledgling competitor in this market and could suffer harm to its own reputation, especially considering that Iowa Paint has failed to establish a likelihood of confusion exists. These harms, coupled with the low threat of harm Iowa Paint currently faces, leads the Court to determine the balance of harms tips slightly in Iowa Paint's favor at this time.

**E. Public Interest**

The final factor a court considers in determining whether to issue a preliminary injunction is the public interest. "The public has an interest in protecting the integrity of trademarks and trade dress." *Id.* (citations omitted). This factor focuses on "the consumer's right not to be confused as to the origin or source of the goods." *Lenox Labs.,* 815 F.2d at 505. More specifically, "[i]n the context of trademark infringement, this factor involves the balancing of the interest in protecting the public from confusion or decep-

**16.** According to the Plaintiff, Defendant's website lists some 43 lines of paint manufactured by Hirshfield's. Of these, only 14 in-clude some variation of the "ProWall" name. This would leave Defendant 29 other lines of paint it can continue to sell in the area.

tion with the interest in a competitive market." *Aveda Corp.*, 706 F.Supp. at 1431–32 (citing 2 McCarthy, *Trademarks and Unfair Competition 2d* § 30:21); *see also Sports Design & Dev., Inc.*, 871 F.Supp. at 1165 (finding this factor involves balancing interest in protecting public from confusion with interest of facilitating a competitive market).

Iowa Paint argues that since Hirshfield's can continue to sell paint in the relevant market area, granting the preliminary injunction would not adversely affect competition in the marketplace. The preliminary injunction would serve to prevent confusion inherent where two companies are providing the same paint goods under basically the same name. However, the Court has found there is no likelihood of confusion, and the costs to Hirshfield's under a preliminary injunction would be high. Consequently, there is little or no public interest in a preliminary injunction at this stage as it would only serve to hinder competition.

## CONCLUSION

The Court has carefully considered Iowa Paint's arguments in seeking a preliminary injunction against Hirshfield's. The Court considered the contentions offered by both parties in relation to the four *Dataphase* factors. The Court finds that Iowa Paint has failed to establish that a likelihood of confusion exists as to the parties' continued use of their respective marks. As a result, the first two factors, the probability of success on the merits and threat of irreparable harm, weigh against issuance of a preliminary injunction. In addition, the Court finds the balance of harms tips only slightly in favor of Iowa Paint, and consideration of the public interest weighs against granting the injunction at this stage of the proceedings. Therefore, the Plaintiff did not meet its burden to show that a motion for preliminary injunction should be granted.

Based on the foregoing, the Plaintiff's Motion for Preliminary Injunction (Clerk's No. 5) must be **denied**.

**IT IS SO ORDERED.**